**21]** *BANK OF MUSKINGUM *v.* CARPENTER'S ADM'RS ET AL.

A second witness, added to a mortgage after its execution and acknowledgment, does not affect its equitable validity.

An equitable mortgage is preferred in equity, when of prior date to a judgment lien.

The purchasers of real estate from executors or administrators, under an order to sell for the payment of debts, where the sale is regular, and the title perfect, hold such estate discharged of liens; but the proceeds of sale are subject to the priorities of lien attached to the land producing such proceeds.

The settlement of an estate by the court, and the distribution directed by such court, is not conclusive on the rights of creditors.

A creditor having a lien on one fund only, may call upon a creditor having a previous lien on the same fund and also upon another, to exhaust first the one not subject to the creditor's lien. But where the proceeds of either fund have been appropriated in good faith, equity will not interfere to disturb such appropriation.

THIS cause was adjourned here for decision from the county of Muskingum.

The bill and amendment state, that between November 18, 1814, and January 20, 1815, complainants discounted sundry promissory notes, on which Emanuel Carpenter, jr., was liable, amounting to eight thousand seven hundred dollars; all of which remaining unpaid on August 14, 1816, they applied to him to secure the payment of the notes by mortgage on real estate; that he mortgaged to them a parcel of land in Fairfield county, containing five hundred and fourteen acres, conveying the same to D. J. Marple, in fee, with a defeasance executed by Marple, providing that the conveyance should be void on the payment of the notes, within three months; that in receiving the conveyance, Marple acted as trustee only, and had no interest; that the deed

15

was executed by Carpenter, in the presence of Wyllys Silliman and Thomas Fricker, who witnessed it; that the deed was acknowledged by Carpenter before said Fricker, a justice of the peace, and recorded; that in recording the deed, the recorder omitted to record the name of Fricker as a witness; that complainants afterward commenced suit in the common pleas of Fairfield county against Carpenter, on two of the notes, to wit: the two thousand dollar and the fifteen hundred dollar notes; and at the November term, 1817, recovered judgments on the first for two thousand three hundred and twelve dollars and fifty cents, and costs; and, on the other, for one thousand seven hundred and thirty dollars and seventy-five cents, and costs; that all the said notes remain unpaid, except one thousand nine hundred dollars on the four thousand and five hundred dollar notes, which was collected from one Loveland, who was a party to said two notes; that at the time the said judgments were rendered, Carpenter was seized in fee of the land described in the mortgage, and also of other lands in Fairfield county, particularly described in the bill; that Carpenter died about February 1, 1818, seized of all the lands described in the bill, possessed of a large personal estate, and debts due to him, but insolvent; that about February 15, 1818, Samuel Carpenter and David Carpenter (who are made defendants as representatives and individuals), were appointed administrators of the estate of E. Carpenter, jr., disposed of all the goods, and collected debts to a large amount, and *neglected to collect part of the debts, by which a loss accrued to the amount of four thousand dollars.

That at the time of the execution of the mortgage and the death of Carpenter, all the lands were clear of incumbrance, except by three judgments in favor of the Bank of Chillicothe, rendered in August, 1816, for one thousand five hundred and fifty-three dollars and sixty cents and costs; one thousand one hundred and seventy-eight dollars and forty-three cents and costs, and one thousand five hundred and nineteen dollars and fifteen and one-half cents, and costs; and that Carpenter, in his lifetime, about March 10, 1817, paid the judgment for one thousand one hundred and forty-eight dollars and seventy-three cents, and one thousand one hundred and twenty-eight dollars and thirty cents, on the one thousand five hundred and nineteen dollars and fifteen and one-half cent judgment; that at the time complainants recovered

their judgments, the lands were clear of incumbrance, except the unpaid judgments in favor of the Bank of Chillicothe; and that the administrators received the sum of eight thousand dollars in a judgment and mortgage given by him to the said Emanuel in his lifetime.

That at the time of their appointment, the administrators had actual notice of all the before-stated facts, and that about June 10, 1818, complainants gave notice to the administrators that the said notes and judgments were unpaid, that the said Emanuel had executed the mortgage, and that the complainants would look to the estate generally, and to the lands particularly, for the payment. of the said notes and judgments; and that such demand has been from time to time renewed.

That on July 20, 1820, the administrators, having obtained an order from the court of common pleas for that purpose, sold the lands described in the mortgage, to divers individuals, as follows, to wit:

| | | |
|---|---:|---:|
| Lot 3 to Frederick A. Foster, for | $155 | 62½ |
| Lot 7 to John Creed, for | 135 | 00 |
| Lot 1 to W. W. Irvin, for | 168 | 98½ |
| Lot 2 to W. W. Irvin, for | 297 | 50 |
| Lot 4 to W. W. Irvin, for | 180 | 40 |
| Lot 6 to W. W. Irvin, for | 135 | 00 |
| Lot 8 to W. W. Irvin, for | 1,159 | 24½ |
| Lot 5 to Irvin & Creed, for | 150 | 31¼ |
| Aug. 17, 1823, Lot 12, to L. & J. Clark, for | 1,649 | 00 |
| Sept. 29, 1827, Lot 9, to Noble and Clark, for | 907 | 33⅓ |
| " " Reversion of Lot 14 to Noble and Clark, | 1,361 | 25 |
| " " Reversion of Lot 10 to George Ring, for | 141 | 19 |
| " " Reversion of Lot 11 to George Ring, for | 150 | 38 |
| Oct., 1828, Reversion of Lot 13 to James Rice, for | 295 | 92 |

*And a short time after Creed purchased, he sold lot No. 7 to [23 Samuel Effinger, and that some other transfers have been made. Complainants do not know how much of the purchase money has been paid, and make all the purchasers defendants, and charge them with notice of the preceding facts. Marple died in 1822, his heirs, and the heirs of Emanuel Carpenter are made defendants. That since the death of Carpenter, the administrators have sold the other lands for four thousand dollars.

The particulars respecting these sales, complainants are unable to state. All the other parties to the notes are insolvent.

The charging part of the bill and amendment also puts in issue the facts, whether the purchasers of the land mortgaged had notice of the mortgage and judgments before the payment of their purchase money; whether Fricker witnessed the mortgage at the time it was executed or afterward, and whether any settlement of Carpenter's estate was made by the administrators, and that if made, it was after the time for settlement had expired, and complainants had no notice, and that the administrators pretended to the court, at the settlement, there were other judgments having a prior lien to the mortgage and judgment of complainants.

*Prayer.*—That the purchasers of the land, contained in the mortgage, may be decreed to hold the same as trustees for complainants; that the said land stands charged with and liable for the payment of said notes; and that if the judgments in favor of the Bank of Chillicothe are paid, that complainants may be substituted to their lien on the lands not contained in the mortgage; that the administrators pay to complainants all the moneys they have received on the lands sold, with the interest; that the purchasers pay the balance of the purchase money remaining unpaid; that all the securities, taken by the administrators for such balances, be assigned to the complainants, and that the administrators pay them a dividend of the personal estate, to appoint a receiver and for general relief.

Noble and Clark answer, deny notice of the mortgage and judgments at the time of their purchase and paying five hundred dollars of the purchase money, and offer to pay the balance as the court may direct.

Frederick A. Foster admits the purchase as stated in the bill, denies notice, has paid no part of the purchase money, offers to relinquish, or do as the court may direct.

24]     *L. & J. Clark plead purchase and full payment of the purchase money, and receiving a deed from the administrators without notice.

The minor defendants, by their guardian *ad litem*, answer, denying the facts.

The answer of Samuel and David Carpenter (filed November 9, 1829,) admits the death of Emanuel Carpenter, and the grant of administration to respondent, the execution of the notes set forth in the bill, and the indorsement as stated in the bill, and require proof of the diligence used to charge the indorsers. The

18

respondents knew, or rather it was known to said Samuel Carpenter, that complainants recovered two judgments in said common pleas, neither the notes nor judgments were ever presented to the respondents as administrators for settlement, and they have no knowledge of ever having seen the said notes. After the death of Emanuel Carpenter, jr., without any demand of respondents for payment and without presentation to them, writs of *scire facias* were sued out on said judgments and disposed of by nonsuit, and afterward nothing was said to these respondents by the complainants or by any one for them in relation thereto. The respondents know nothing of the execution or delivery of the mortgage or imperfect instrument set up in the bill; they can not say whether it was executed by Emanuel Carpenter, nor whether it was executed and delivered in the presence of Thomas Fricker, but require proof. In the year 1818, a *scire facias* was brought against the respondents on that mortgage, and in some way it was ascertained that a material alteration had been made in the mortgage, by adding thereto another subscribing witness, in consequence of which a plea of *non est fuctum* was filed with an affidavit; after which the complainants suffered a nonsuit. Respondents are of the opinion that they derived their knowledge of said alteration from their counsel, who examined the deed as recorded in the recorder's office, and they are satisfied that they were not informed of the alteration by the complainant or Marple, until after their plea was filed, when the counsel who brought the suit admitted the fact, and suffered a nonsuit; from which time, until the commencement of this suit, they had no intimation that said mortgage would be relied on in law or equity for any purpose. The respondents, after the letters of administration were granted to them, found that the personal *property was insufficient [25 to pay the debts, and that judgments to an immense amount had been recovered against the said E. Carpenter in his lifetime, and that it was necessary to sell his real estate.

At the March term, 1820, an order of court was made for sale of the land on which E. Carpenter had resided; and on July 15, 1820, a number of lots were sold to Wm. W. Irvin. Respondents have read and adopted so much of said Irvin's answer as relates to the sale to him, payments, order of confirmation, execution of the deed, etc. They also adopt that part of said Irvin's answer in relation to the legal proceedings on said mortgage, and the writs

19

of *scire facias* to revive said judgments of the complainants. (Here follows a list of the sales of the real estate made on July 15, 1820, on October 17, 1823, on September 29, 1827, and October, 1828.) Two of the purchasers have received deeds, viz: W. W. Irvin and Joshua Clark. Defendants having doubts as to whether judgment creditors of an insolvent estate had any priority, made a case, and submitted the same to the Supreme Court, which decided that the judgment creditors had a priority, to which decision the defendants conformed. Defendants being desirous to close their accounts, as far as practicable, filed their papers in the common pleas for settlement, and at the March term, 1828, the court approved of the payments made, as exhibited in schedule K, which payments were made from the sale of said real estate. The amount of the sales, including Leathers' land, was then about twelve thousand eight hundred and fifteen dollars and twenty cents. Since that time the defendants have paid the Bank of Chillicothe, in full of all their judgments, the further sum of one thousand two hundred and eleven dollars and thirty-six cents, out of the real estate proceeds; the said settlement with court was made in good faith, and in obedience to a citation, and is made a part of the answer, etc.

The answer of William W. Irvin, filed November 13, 1829, admits the execution of the notes set forth in the bill, and the indorsement of the notes, but requires proof of due diligence to fix the indorsers. In 1818 respondent was engaged as counsel to defend a suit brought by David J. Marple against the administrators of E. Carpenter, jr., on a mortgage purporting to have been duly executed by said E. Carpenter to said Marple. Respondent presumes he was then advised and believes such to have been the fact, from the plea filed in the cause that after the execution of the deed, a material alteration *had been made by adding a subscribing witness, there having been but one at the time of its delivery, if delivered, and at the time it was recorded, as will appear by the record, reference to which is hereby had. The plea of *non est factum*, supported by the affidavit of said Samuel Carpenter, jr., was filed, and at the ——— term, A. D. 18——, the cause came on for a hearing, and the plaintiff suffered a nonsuit. Respondent is not conscious of ever having seen the original mortgage, but recollects that it was admitted by Wyllys Silliman, Esq., who was on that occasion the attorney for the plaintiff, that the alteration was made, but whether the deed was subscribed by the second wit-

Bank of Muskingum *v.* Carpenter's Adm'rs et al.

ness before or after the death of E. Carpenter, jr., defendant does not know, but requires proof of the time. From that time to the filing of this bill, this defendant believed that was an end to all claims under the said deed, and never heard directly or indirectly that complainants, or any one of them, intended to claim the land in said deed specified. Order of the court authorizing the administrators to sell lands for payment of debts. Sale had July 15, 1820, under which defendant became the purchaser of eight lots. At the March term, 1829, sale to defendant confirmed by the court, and administrators ordered to make a deed to defendant, which deed was according made and delivered, May 12, 1829.

(The answer then gives a statement of the payments made by the defendant on his purchase, and his allowance for fees as counsel for the administrator, leaving a balance due from him of about one hundred dollars.) The sales of real estate were nearly, if not quite, all made before the pretended claim on the mortgage was again brought forward; the purchase money was also, to a large amount, distributed among the judgment creditors and others, and the payments sanctioned by the court at the March term, 1828.

Defendant took possession of land so purchased by him, and has made lasting and valuable improvements. He purchased in good faith, at a high price, and under the belief that his title was undisputed. There are a number of judgments in favor of the Bank of Chillicothe older than the complainant's judgments; also one in favor of Gilman and Ammidon; one in favor of John Baldwin; one in favor of Bosler and Huber, and defendant refers to the judgments for greater certainty. Defendant is not aware that any consideration *was given to E. Carpenter, jr., as an induce- [27 ment to sign said mortgage, other than the three months time stated in the defeasance, if *that* forms a consideration, and requires proof of the consideration, and also of the delivery of said deed. Defendant knew of the complainant's two judgments, but at what time he acquired this knowledge he can not recollect. The settlement with the court was made openly and in good faith, etc.

Amended answer of Samuel and David Carpenter (filed November 13, 1834). These defendants, in regard to the pretended mortgage, set up in the bill and amended bill, answer as they have already done—(then follows a statement of the sale of the Leathers

land, and the application of the proceeds, which is not abstracted, as it is understood the counsel for complainant asks no relief touching that). In respect of the alleged devastavit of the estate of said E. Carpenter, jr., by defendants, they deny the charge, and exhibit certain schedules (A, B, C, D, E, F, G, H, I, J, and K), showing their proceedings to which reference is made. Since the settlement (of 1828), defendants have received about one thousand three hundred and sixty-six dollars and thirty-four cents, from the sources pointed out in schedule "L," and have paid it out as shown in same paper.

Prior to the death of said Emanuel Carpenter, jr., the defendant, Samuel Carpenter jr., was associated in partnership with him in the business of merchandise. Defendant withdrew from the concern prior to the death of E. C., jr., under the agreement that he was to be saved harmless from the debts, and be reimbursed for his capital advanced, to wit: four or five hundred dollars. Since E. C., jr.'s, death, defendant, S. Carpenter, jr., as surviving partner, has been engaged in settling up the debts of the concern, and finds it insolvent—has paid debts out of his private means, and has not received his capital advanced, except about one hundred dollars.

Amended answer of W. W. Irvin (filed November 20, 1835). The defendant is now of opinion that he erred in his former answer, in stating that the cause was managed at the trial by Wyllys Silliman, Esq. It is now his opinion that Charles R. Sherman acted as attorney for the bank on that occasion.

Replication to the several answers and plea.

The other defendants as in default.

The complainants have taken the depositions of Wyllys *Silliman and Thomas Fricker, the subscribing witnesses to the mortgage.

Wyllys Silliman swears, that the mortgage was, as he fully believes, executed in the presence of Thomas Fricker, Carpenter, and himself, and that Fricker signed the same as a witness at the time of its execution, and that he does not believe that the mortgage was in the possession of Fricker, or that he had an opportunity of signing his name as a witness, from the date of the execution of the mortgage, until a dispute arose respecting the time at which Fricker signed the deed as a witness, and that from the best of his recollection, the mortgage was in his (deponent's) possession until about the time it was delivered to the recorder for record.

Bank of Muskingum *v.* Carpenter's Adm'rs et al.

Thomas Fricker swears, that he attested the deed as a subscribing witness on August 14, 1816; he presumes that this was the time from the date of the deed, and that it was acknowledged before him as a justice of the peace.

On cross-examination he states, that he resided in the town of Lancaster from the year 1805, until the time of taking the deposition; that he was a justice of the peace from 1811 to 1817, and that he did a great deal of business as such; that from the time of the execution of the deed, it was a considerable time before the subject was brought to his recollection or notice, perhaps seven or nine years, when he was inquired of respecting the acknowledgment of the deed, by a person who, he was informed, was a lawyer from Zanesville, and at that time he only recollected that he took the acknowledgment; that he could not, at that time, have testified that he witnessed the deed, if he had not seen his name as a subscribing witness, and that he has no other ground for stating that he was a witness, than from the fact that his name is there as a witness; that when he took the acknowledgment of a deed, and at the same time subscribed his name as a witness, he sometimes used one kind of ink in signing his name to the acknowledgment, and a different kind in signing his name as a witness, but that it was owing to the kind and quality of the ink; that when it was too thick, he would add other ink which might make a difference in color; that he never did place his name, as a witness to a deed or other instrument, at any other time than at the time of executing the instrument, or in the presence of the party making it. That when called upon to sign a paper, he does not charge his memory, or read the contents, when he *supposes the parties are com-  [29 petent to understand it themselves, but otherwise when called upon specially to make the contents known to one of them, and further, that in the deed above referred to, he did not think it necessary even to inquire into the contents.

### DEFENDANTS' TESTIMONY

Deposition of Wyllis Silliman (taken by defendant October 22, 1835). I was the attorney for Bank of Muskingum in the years 1818–'19–'20, and several other years; I, or Mr. Sherman under my directions, commenced a suit in Fairfield common pleas on the mortgage; I have no recollection whether or not I was informed of the plea and affidavit filed before nonsuit, but suppose Judge

Sheaman would have communicated so important a fact, nor can I recollect that Judge Sherman advised me of the result of the trial. I suppose I knew of the death of E. Carpenter, and that his estate was in a course of settlement, and I can not now assign any reason why the claim of the Bank of Muskingum against him was not prosecuted; except that about the time of his death, this claim, among others, was assigned by the Bank of Muskingum, to the agent of the United States, to secure a debt, and the future management was in the hands of J. C. Wright, district attorney. During the administration of J. Q. Adams, I made an arrangement with Mr. Rush, then secretary of the treasury, for the relinquishment of the lien of the United States on the claim so assigned, by the payment of the debt due the United States by the Bank of Muskingum, and one-half the interest which had accrued from the period of the assignment. I am of the opinion that there was a regular assignment to the United States, and that no steps were taken by the United States upon the claims assigned whilst their lien continued. I do not recollect that any claims of the Bank of Muskingum were ever presented to the administrators of Carpenter by me or any other person. In the negotation with Mr. Rush, for the reassignment of the claims, I am under the impression that I urged a release of all the interest, because of the neglect of the government in not prosecuting them. Mr. Buckingham (the president of the bank) gave it as his opinion all the interest ought to be remitted by the United States for that reason. My impression still is, that Fricker attested the mortgage at the time of its execution, and that I retained it until .30] it was handed by me to *the recorder; I have no recollection who received it from the recorder's office, nor whether Judge Sherman had the mortgage during the suit; but presume, from the nature of the case, that he must have had it. Mr. Buckingham could have had access to the paper at any time whilst it was in my possession, but whether he had or not I can not recollect; I have a very imperfect recollection of the custody of the mortgage from 1819, until I gave it to Mr. Stillwell, within four years ago, but I am rather impressed with the belief that it was with me during that period. I was a director and stockholder in the Muskingum Bank some time after 1820; the Carpenter debt was considered doubtful, and the reason I think was information that the deed was recorded with only one witness, in consequence of

which other creditors had taken the land; the decision upon the *scire facias* was probably known.

P. Beecher. The attestation of Thomas Fricker to the document marked (A) was not on the deed at the time of the controversy in court growing out of the same, and Mr. Silliman gave up the cause on that account; there was but one witness to the deed, and it was rejected by the court on that account. I do not remember whether Judge Sherman or Mr. Silliman conducted the cause, but am of the impression it was Mr. Silliman; is distinct in his recollection that there was but one witness, and that the objection was made and sustained.

H. H. Hunter. I am acquainted with Thomas Fricker's handwriting. I have examined the signature of Thomas Fricker to the attestation and acknowledgment of the complainant's mortgage, and his genuine signature to old papers. Independently of the comparison of those signatures, I could not pronounce either of the signatures in the mortgage a forgery. In making comparisons, the signature to the acknowledgment corresponds more exactly to other genuine signatures than does the signature in the attestation. In all the genuine signatures which I have examined, there is a stop between the *c* and *k*, the name from the capital *F* being uniformly written to that point continuously, without raising the pen. This stop is to be seen in the name at the acknowledgment, but is wanting in the name to the attestation; if either of these signatures is not genuine, it is that of the attestation. I incline to think, without collateral information, *and relying on my own judgment and knowledge, I should [31 not have been able to pronounce the attestation signature a forgery, but have taken it to be genuine.

M. Z. Kreider. Has paid considerable attention to handwriting of individuals, has examined the signature at the attestation and at the acknowledgment of the deed, and is of opinion that they are not the same handwriting, nor made with the same ink nor same pen, and that the attestation signature is not the same handwriting, ink or pen, with the body of the instrument. I have examined a large number of genuine signatures of Fricker, and would say, from the result of this examination, that the attestation signature is not the same handwriting, but the acknowledgment is the same with the genuine signatures.

Cross-examined. The distinguishing difference in the attesta-

tion and acknowledgment signatures is the non-joining of the *c* and *k*. I wrote the name, Thomas Fricker, on the paper on which my own name is also written; this *fac simile* more nearly resembles the signatures of Fricker than the attestation signature resembles them. I made the *fac simile* the 17th inst. I never attempted a *fac simile* of Fricker's signature before; it was the third effort. I did not take the pains with it I might have done; consequently, did not make it so perfect as I might.

Jacob Beck. I am acquainted with the handwriting of Fricker, has seen him write, and has seen a great deal of his writing, and does think (N. B. In the original deposition it is written, by mistake, "does *not* think") that the attestation to the deed is not the handwriting of said Fricker.

Cross-examined. If the attestation signature has been exhibited to me alone, without comparison, I could not have formed an opinion. Agrees with Kreider's deposition.

Thomas Ewing, having appeared on the part of the defendants; and having been duly sworn, according to law, deposeth and saith:

That he recollects to have been present when a suit, commenced by *scire facias*, in the court of common pleas for Fairfield county, between David J. Marple, plaintiff, and the administrators of Emanuel Carpenter, deceased, defendants, was discussed in court. It is my impression that the cause was submitted to court upon an issue testing the validity of a mortgage deed. I distinctly recollect to have heard it said in *court at the time, that the deed had but one witness. I think I saw the deed at the time, but of this I am not certain, and I am pretty distinct in my impression the cause was conducted by Mr. Sherman, as the friend of Mr. Silliman, who was counsel for the plaintiff, but who was absent at the time. The name of Marple I understood to have been used for the Muskingum Bank, which was the real plaintiff.

My attention was again called to this subject, a year or eighteen months after; at which time I was engaged, by the Bank of Chillicothe, to collect a very large amount of the estate of Carpenter, consisting in judgments rendered against Emanuel Carpenter in his lifetime, and which would have the precedence over the claim of the Bank of Muskingum, if this mortgage were invalid; but part of them would have been cut out by it if it were valid.

During the progress of these causes, I know well that I went upon the position that the mortgage deed was defective in that

Bank of Muskingum *v.* Carpenter's Adm'rs et al.

particular; and guarded as well and as speedily as possible against an attempt (which I thought might be made) to set it up in equity—and further saith not.                                    T. EWING.

Also came Elnathan Scofield, who, being duly sworn, deposeth and saith:

That he was in the court-house in Lancaster, some years ago, when the cause of the Bank of Muskingum against the administrators of Emanuel Carpenter, was called up for trial; and recollects that the mortgage deed, which was produced (being the same referred to in the deposition of T. Ewing), was admitted to have been defective, inasmuch as it had the signature of but one attesting witness. Deponent does not remember to have examined the deed; but it is distinct in his recollection that the cause was called up, and that the subject was talked over by the counsel at the table; and it was agreed, on both sides, that the mortgage being defective in respect to the attestation of witnesses, that the suit could not be sustained. Deponent further states, that, in consequence of this defect, the cause went out of court, and further, that the cause produced a considerable degree of excitement at the time, both in and out of court, there being a number of persons interested in it, as the mortgage covered the lands of Emanuel Carpenter, jr. And further saith not.

E. SCOFIELD.

*Also came Hugh Boyle, and, being sworn according to [33 law, deposeth and saith:

That he was recorder of deeds of the county of Fairfield in the year 1817; and on the 5th day of February of the same year received a mortgage deed to record, of which the document marked (D) and herewith attached is a copy; and that said deed was recorded in his (deponent's) own handwriting of the record of the above date; and when so recorded, there was but one subscribing witness thereto. Deponent further states that, recollecting this defect in the deed, he paid no attention to the proceedings in court, so as to be able to state anything definite of what there occurred; further saith not.                                    HUGH BOYLE.

Samuel Carpenter. I became convinced (and how I do not recollect) after the suit on the mortgage was commenced, and while it was pending, that the mortgage was defective, as it was attested but by one subscribing witness. I heard nothing further

. of this mortgage' from the dismissal of that suit until within a week of the commencement of this suit; and no demand was at any time made on account of said mortgage, or for any claim , growing out of the same, unless the prosecution of the *scire facias* was a demand.

William Crook. Was deputy sheriff, and, present at the trial of · the *scire facias;* heard that the mortgage had but one witness, and · I understood that when it was found out ·that there was but one · subscribing witness, Thomas Fricker then added his name as a witness. There was considerable excitement about it at the time · in and out of the court-house.

The said Dan Convers deposeth and saith: That in the year . 1812, and until. 1824, he, the said Daniel, was a stockholder .in the Bank of Muskingum, and a director in the same institution in the year 1824 and the preceding year; and knows that a suit was brought by the said bank against said Emanuel Carpenter, jr., on a mortgage supposed to have been executed to Marple for the benefit of the bank, and was advised as a stock- ·holder that the bank failed in obtaining judgment on the said mortgage; can't distinctly identify the time when he heard of the result of the suit, but thinks it was before he sold out his stock in ⸰said bank. Ebenezer Buckingham, jr., was a stockholder and president of said bank from the year 1817 until his death in 1832; has had conversation with said Buckingham on the subject of the 34] above-mentioned *suit on the mortgage, and thinks he was first informed of the failure of said suit by said Buckingham, and ;his impression is that said· Buckingham told him that the bank ·lost the suit because there was but one subscribing witness to the .said mortgage. The. reason and the cause of failure in the suit was inquired into, and was ascribed to the want of one subscribing witness to the mortgage, and the magnitude of the sum involved .made those interested attentive to the matter. Never heard until recently that there was a second witness to the deed; never in- .quired particularly. In a conversation between said Buckingham and this deponent, it was concluded that if there was loss, Mr. .Silliman, who was the attorney for the bank in obtaining the said .mortgage, ought to bear it, and that they both were complaining of Silliman's neglect. Deponent further states that all the claims ⸰held by the bank against said Carpenter were assigned by said ⸳bank to the United States as security; so far as this deponent has

any knowledge of the matter, he believes such assignment to have been made. In 1824, there was an order of the directors that any stockholder might transfer his stock in payment of debts at seventy-five per cent., reserving the residue to pay the debts of the bank; that this deponent, on reflecting on the situation of the concerns of the bank, came to the conclusion to sell out his stock, and accordingly sold and transferred his stock to the bank; thought at that time that the Carpenter claims were doubtful; that among the claims transferred to the United States there was fifteen thousand dollars of debts considered doubtful, among which were the said Carpenter claims.

Cross-examination by counsel of complainant:

It was my opinion, and the opinion of the other directors, so far as I know, that the bank considered themselves liable to the United States for any loss that might arise in the debts assigned by the bank to the United States. It was said that the failure in the suit was owing to the want of one witness to the mortgage. Never heard anything said about the record of the mortgage; never saw the original mortgage until this day. From the books of the bank, it appears that the assignment from the bank to the United States was made January 19, 1821, and the amount assigned forty-two thousand seven hundred and eighty-three dollars and twenty-nine cents. This deponent believes that the assignment was made as the same appears from the bank to have been made.

*STILLWELL, for complainants : [35

The first and most important questions in this case are : Did Thomas Fricker subscribe his name as a witness to the mortgage ; and if so, when ? The defendants deny that he ever subscribed it, and assert that his name appended to it is a forgery. To sustain this position, they rely on the depositions of H. H. Hunter, M. Z. Kreider, and Jacob Beck. The first witness does not pronounce any opinion, but states that, had he formed an opinion from his general knowledge of Fricker's writing, he should have thought it genuine; the second knows nothing of the writing, except by comparison, and by comparing this signature with the acknowledged signature of Fricker, he believes that this is not genuine ; the last has seen Fricker write, but is unable to form an opinion from this knowledge ; he agrees with Kreider as to the compari-

·son with other writings. Without examining how far this testimony is competent, I proceed to inquire into its effect. The signatures of Fricker, from which the witnesses form their opinions, are before the court, and we ask the court to examine them. The only difference pretended by the witnesses between the genuine signatures of Fricker and the alleged forgery is, that in the former the *c* and *k* are not joined, and in the latter that they are; otherwise this forgery is admitted to be successful, defying even the microscopic examination of one of the counsel who argued the case on the circuit. There is indeed a remarkable uniformity in this particular. There is also another characteristic in his signatures as uniform as this, that is, that in writing the name of Thomas he leaves the same space between the *o* and *m* as he does between the *c* and *k* in his last name. The defendants might as well contend that the signature was a forgery where the *o* and *m* are connected as where the *c* and *k* are; yet in two of the signatures admitted to be genuine, and in that to his deposition, the *o* and *m* are joined, and the *c* and *k* are joined in one of the admitted genuine signatures (marked A B, No. 1). Indeed, the connection between the *c* and *k* is a strong evidence of the genuineness of the signature. In all imitations of handwriting, the veriest bungler in the art of counterfeiting will observe and strictly copy the marked peculiarities. It is only the general appearance, and so to call it, the countenance of the writing that betrays the imposture. Yet, in this case the general resemblance to the genuine signatures of **36]** Fricker is *fully preserved, while it differs from the particular characteristics; and what would be more singular, were it a forgrey, it more nearly resembles some of the other signatures of Fricker than the one attached to the same paper, which was before the forger at the time he committed the forgery. On the hypothesis of forgery, how do gentlemen account for the space between *o* and *m* and the connection between *c* and *k?* If a forgery, the space was left between the two first; because it was so in the original, the attention of the forger was directed to this peculiarity; and for the same reason would have been directed to the last. Although his intention had not been called to this particular, Kreider, in his imitation, leaves the vacancy between the *o* and *m*.

The defendants next claim that, admitting it to be genuine, the signature of Fricker was not made at the time the deed was executed by Carpenter. To support this, they assert that the name

of Fricker, as a witness, was not written with the same pen or the same ink as his name to the acknowledgment. An inspection of the paper will show that little confidence can be placed on this ground. His name, in either case, is manifestly not written with the same ink used by Carpenter and Silliman. The color of the ink in both his names is the same; one a shade darker than the other, but both having the same peculiar tinge. There is certainly not enough difference to rebut the presumption that they were written with the same ink and pen. And even if they were, what would follow, but that the pen not suiting him, or some other circumstance intervening, after he had written the name in one place, took another pen, and either used the same ink or from another stand; or, as he states, finding that the ink was too pale or too thick, he refilled the stand. Either of these would have accounted for a much greater difference of color in the ink. Repeated experience must convince any one that no weight can be attached to such a circumstance.

The testimony of P. Beecher, T. Ewing, E. Scofield, and W. Crook, is taken to prove that there was but one subscribing witness to the mortgage at the time of the *nonsuit* on the *scire facias.* The witnesses do swear that the deed was present, and that there was but one subscribing witness. It happens, unfortunately for this testimony, that W. W. Irvin, Samuel and David Carpenter, have all sworn directly to the contrary. I deny that the defendants can introduce *testimony to disprove a fact stated in the answer, [37 or to make a case different from that set up in the answer. But admitting that they might do so, more reliance is certainly to be placed on the recollection of parties who are interested than in that of persons who have no interest in observing or remembering. The affidavit written by Irvin, and sworn to by Samuel Carpenter, and attached to the plea to the *scire facias,* fully shows that both Irvin and Samuel Carpenter knew that the names of two subscribing witnesses were at that time attached to the mortgage. It is entirely clear, then, that the gentlemen who testify that they saw the original mortgage at the time of the *nonsuit* of the *scire facias* are mistaken; not in the fact that they saw a paper to which the name of but one subscribing witness was attached; not in the fact that there was a conversation respecting it, but in the fact that this paper was the original .mortgage. The case was not managed by the counsel who brought it, or who was employed by the plaintiffs;

but as appears by the testimony of Mr. Ewing, "by Mr. Sherman, as the friend of Mr. Silliman." He was not furnished with the original deed; the record is produced showing it to have but one witness, and he submits. Prudence would have required, knowing as he did the grossly negligent habits of the officer who made the record, that the record should not have been relied upon; and no doubt he would have so acted had he been the counsel employed. The fact of the *nonsuit* is communicated to the Bank of Muskingum, with the reason of the failure, the mortgage remaining in the possession of M. Silliman; the bank takes it for granted, without examination, that there is but one witness; its affairs are in a distracted condition, without a regular board of directors; shortly afterward the whole matter passes from their hands, by assignment, to the United States. With a careful or attentive counsel managing the business, or had the bank been located at the place of trial, or the mortgage the property of an individual, this probably would not have happened. How far Mr. Silliman sustains the character of a careful lawyer, it is unnecessary to state. At the earliest period after the complainants regain the control of the matter they proceed, and it is the impression of Mr. Silliman that after the mortgage was recorded, he retained possession of it until he delivered it to the counsel who filed this bill. That counsel also fell into the common error, and framed the *original bill accordingly; whether from an inspection of the affidavit filed by Carpenter to the *scire facias*, or by information derived from one of the defendants, can not appear, as that counsel can not be a witness. The bill now asserts that the deed was witnessed by Fricker at the time of the execution. The only fact or circumstance going to disprove this position is contained in the deposition of Mr. Boyle, who testifies that the mortgage had but one witness at the time it was recorded. One can readily conceive of a careful, much more a very careless recorder, omitting the name of one witness to a deed, and after the lapse of years, substituting with the strictest integrity a recollection of the record for that of the original. To rebut the testimony of Mr. Boyle, the complainants have the testimony of Mr. Silliman and Mr. Fricker. The first swears that he fully believes that the deed was witnessed by Mr. Fricker at the time of the execution. Mr. Fricker swears that he does not recollect the fact of witnessing the deed, but that the signature is his, and that he has no doubt that he witnessed it at the

Bank of Muskingum *v.* Carpenter's Adm'rs et al.

time it was executed, and that he did not witness it at any other time; that he never witnessed a deed except when he saw it signed, or in the presence of the party who signed it. Now, Mr. Fricker ought to be a judge of the genuineness of his own signature; at least as good as a man who never saw him write, and whose attention is first called to his signature, by a suggestion that it is counterfeit, and who goes into the examination with a disposition to find it so, and that he can detect it as readily as others. There is nothing singular in the fact that Fricker does not recollect the act of witnessing the deed; it was no doubt an every-day occurrence, with nothing in the case to impress it upon his memory. But had he witnessed it at any other time, the circumstance would have been so much out of the ordinary course, that he must have recollected it, particularly if it had been when Carpenter was not present. He says that he never did witness this or any other deed except at the time it was executed, or in the presence of the person who signed it. As this was a general rule, a deviation would have made an impression on his memory. The act of doing it would not have been of course; to induce him to sign his name, explanations would be made, arguments used; he to sustain his general rule, and the person applying to induce him to change that rule, all calculated to *make an indelible im- [**39** pression. The case then stands on the question, whose testimony shall outweigh, Boyle or Fricker's? I mean not in point of integrity, for both are undoubted. But who, under the circumstances, would most probably be correct? In addition to this, there is the testimony of Mr. Silliman. The circumstances attending the transaction, and all the probabilities, are in favor of witnessing at the time. The parties went there for the purpose of having the deed properly executed. Silliman and Fricker both knew that two witnesses were necessary. It is also quite as probable that Boyle would have omitted the name of Fricker in the record as that Fricker would have omitted to witness the deed. The conclusion to my mind is irresistible that Fricker witnessed the deed at the time of the execution, or that his signature is a forgery.

Let us examine how far a person could expect to derive any benefit from the forgery. If a forgery, it must have been committed after the deed was recorded, and before the time of filing the plea to the *scire facias* (September 18). I trust that I have

succeeded in showing by the answers of Irvin and the Carpenters, and the affidavit to the pleas, that there were two witnesses at the time the affidavit was filed. If a forgery, the evidence against it would have been, first, the record, and as the matter was recent, the danger of the recollection of Boyle, Fricker, and Silliman, together with the loss of all hope of settling up the mortgage in equity. If a forgery, by whom was it made? Mr. Silliman's impression is, that it always was in his possession.

The deposition of Samuel Carpenter, one of the defendants, is taken on the part of Irvin. It can not be received as testimony. There is no order for taking it. He does not state a single fact. At some time, when he does not state, how he does not remember, he became convinced that Fricker did not witness the deed at the time it was executed.

Place the case, however, on the ground assumed by the defendants, that Fricker did attest the mortgage at a time subsequent to the execution. We contend that if he were present and saw it executed, or if it had been acknowledged before him by the grantor, he might rightfully do so; that this attestation would make the mortgage legal between the parties themselves, by relation to the time the mortgage was executed, as to other persons 40] after they had notice of the *additional attestation. Whether Fricker did or did not witness the mortgage at the time of its execution, it was undoubtedly the intention of the parties that he should do so. There is nothing in the statute which requires that the act of subscribing by the witnesses shall be contemporaneous with the acknowledgment or in the presence of the grantor. Undoubtedly the party claiming the benefit of the conveyance must show that the subscribing witness was present and saw the deed executed, or heard the grantor acknowledge it. And that not a casual presence or acknowledgment, but under such circumstances as would clearly show that he intended it should be witnessed by the person who subsequently does witness it. This is abundantly shown in this case. It is also admitted in the answers of Irvin and the Carpenters, that Fricker did subsequently witness it. With these limitations, I can conceive no objection to the subsequent attestation. In an action of ejectment in the Supreme Court in the county of Guernsey, some years since, a deed was offered in evidence, to the acknowledgment of which the justice

had not affixed his seal; the justice was in court, there affixed his seal, and the deed was then received in evidence.

So far from admitting the effect produced by Fricker's subsequent attesting the mortgage as claimed by the complainants, the defendants contend that such witnessing would be fraudulent and entirely destroy the mortgage as an equitable one. An alteration made in any written instrument, without the consent of the other party, avoids the contract; but we contend that this is not such an alteration; that it was an act the complainants had a right to do, or to have done. It is not an alteration of anything signed by the party, but merely doing by another person what the grantor intended that person should do; an addition, but what he intended the other person should make, and the time of making which was to the grantor no way material. I would here remark that if the attestation of Fricker were at a time subsequent to the execution by Carpenter, it must have been in the presence of Carpenter, otherwise Fricker would not have attested the deed, or if he had in the absence of Carpenter, for the reasons before stated, he would have remembered the fact.

This mortgage was recorded with the name of but one subscribing witness. We admit that this record is not notice. *The [41 administrators had actual notice by the service of the *scire facias*, and Irvin at the time of filing the plea (September, 1818). We admit not notice that Fricker witnessed the deed at the time of its execution, but notice that there then were two subscribing witnesses, and notice to all defendants that the mortgage was subscribed by two witnesses, at the time of its execution, by the filing of the amended bill.

What are the consequences flowing from these facts? Admitting that the mortgage was witnessed by Fricker at the time it was executed, we presume that our right to the unpaid purchase money on the sales by the administrators will not be questioned. We claim more:

1. That, admitting that the mortgage was attested by Fricker, not at the time of the execution, but subsequently, as Irvin and the Carpenters had notice before any of the sales were made, the mortgage is valid, subject only to the judgments in favor of the Bank of Chillicothe, rendered prior to the date of the mortgage.

2. That, admitting the subsequent attestation of Fricker to add

nothing to the validity of the mortgage, we contend that it is an equitable lien, which a court of equity will protect and enforce.

As between Carpenter in his lifetime, and the complainants, on this question there would be no doubt, we contend that his death makes no difference; that his administrators in this respect, representing his creditors, stand in the same situation that he did in his lifetime. On the circuit, this was admitted as to general creditors. It is nothing more than applying the familiar rule that, equity considers that as done which is agreed to be done. The application in this particular case is sustained by authority—2 Powell on Mortgages, 435, 436. "If money be lent, and there is a contract or agreement for a mortgage, if the party dies without making the mortgage, and the estate descends to the heir as assets for specialty debts, that contract is superior to the rights of those specialty creditors. And a court of equity, after the death of the party, and when all their engagements are to be arranged, will give a specific lien." Defective mortgage sustained against the lien of a judgment cited.   1 P. Wms. 279.

An imperfect agreement, intended as a security, will be supported as a mortgage, even against judgment creditors.   *3 Des. 74; 2 Des. 564.   See also 3 Vesey, 576, in which the whole doctrine is discussed; and 3 Ohio, 527, where the court sets up a defective conveyance against a subsequent judgment. A defective mortgage is considered an agreement to execute a mortgage. A judgment has not a specific lien until levy. It is merely an incumbrance at large, and does not become specific in its character until levy. This was admitted on the circuit, but it was claimed that the judgment had been levied on the land contained in the mortgage, and therefore was entitled to priority. I do not admit the principle, but it is unnecessary to discuss it, as no execution has ever been levied on the land in controversy. The defendants are mistaken in their answers, and counsel in their assertions. The certificate of the clerk shows that all the levies were made on five hundred and fifty-three acres in section 13 the land in controversy is in section 12. On their own admissions, then, and which was the only recognition of the acknowledged law, this mortgage, even as an equitable one, has a lien superior to all the subsequent judgments. The complainants contend that the mortgage has not lost its priority, but not being recorded with the two subscribing witnesses, within six months, or before the judgments were rendered.

Whatever may be the law at this time, by the statute then in force, a mortgage did not lose its priority over a subsequent judgment, provided the mortgage were recorded at any time before a sale under the judgment. 4 Johns. 216. No sale was ever made under any of these judgments.

The defendants claim to be discharged from their liability, because the demands were not presented to them. I do not know what they call a presentation, for at the same time they set up this defense, they admit notice of the notes, mortgage, and judgments before the land was sold; and that a *scire facias* on the mortgage and on the judgments was served on them; a more formal notice, demand, and presentation I can not conceive.

They also allege that the present bill is too late, and that they supposed the plaintiffs had abandoned all claims on the mortgage, and had consented to throw away the ten or fifteen thousand dollars. I admit no length of time less than that presented by the statute of limitations sufficient to bar a claim on the mortgage; that would not be less than fifteen years, and the bill was filed within that period. No part of the *conduct of the plaintiffs [43 was calculated to induce a belief of an intention to abandon the claim. Suffering a nonsuit is saying in the plainest language, we are satisfied that we can not succeed in this form of action, or at this time; but we will not have the door closed; we intend to make another trial. The creditor of an estate, after giving notice of his demand to the administrator, is not barred by mere delay less than the statute of limitations. He may safely wait, and if the administrators pay out the funds to his prejudice, or if they sell lands on which he has a lien, it is at their and the purchaser's peril. Neither can they justly complain that they or their counsel mistook the law of the case, and that they will now be prejudiced by a correct application of the law.

The law prior to the act of February 12, 1824, did not authorize administrators to sell lands, incumbered by mortgage, by an order of court. They might doubtless have done so by application to a court of chancery, making the mortgagee a party. The sale by the administrators, prior to that time, does not affect the mortgage. The act of 1824 authorizes a sale of land incumbered by a mortgage only in a case where there is a prior judgment. 2 Chase's Stat. 1308. The sales of the lands, prior to 1824, were more than sufficient to pay off the prior judgments. The complainants

therefore claim that all the sales beyond sufficient to pay these judgments are as to them fraudulent and void.

The defendants next seek to protect themselves under the settlement made with the court in 1828. This was made long after the time of settlement had expired, without notice to complainants, and yet it is claimed that they are bound by it. The accounts are filed and settled at the same term. It would be a very easy matter for an administrator to protect himself if a course of this kind were sufficient for the purpose. But the court in that settlement only find the facts that the administrators had received and paid out certain sums of money. They do not pre tend to decide as to the very facts now in dispute, whether complainants had a prior right to the money. That question was not before them. The court decide in the case of Piatt *v.* St. Clair's Heirs, 6 Ohio, 227, that an order of this kind is fraudulent and void. There was fraud in this case, whether morally or not, does 44] enter *into the question; they paid money to others to which we were entitled, and with notice of our lien.

With respect to this settlement, it may be further remarked that because they have made payments to a greater amount than they have received from the land, it is claimed that they shall have the benefit of the unpaid purchase money to reimburse them for such advance payments. We contend that such advances can not prejudice our claim to the unpaid purchase money.

The defendants also seek to protect themselves under the alleged liens of the judgments. I have endeavored to show that such liens are inferior to the mortgage. Admitting the contrary, these liens can apply only to the sales of July, 1820; before the next sales all the judgments had become dormant, except those in favor of the Bank of Chillicothe, and were never revived. As they were levied in the lifetime of Carpenter, the land, as the law then stood, might have been sold under these judgments, and so the judgment creditors acted, for they all issued writs of *vend. ex.* after his death, returnable to the June term, 1818. Whatever then might have been their lien against the mortgage, it ceased when they became dormant.

Suppose the mortgage entirely void, the application of the proceeds of the sales to the payment of judgments dormant at the time of sale was inequitable; the fund belonged to the general creditors; the proprietors of these dormant judgments stood only

Bank of Muskingum *v.* Carpenter's Adm'rs et al.

in that position.  They could not complain, for their own neglect placed them in that position.  Should the loss now fall on the administrators who have misapplied the funds by payments to them. it is their own mistake, not that of complainants.

The defendants urge that it is a badge of fraud that complainants did not proceed diligently on the mortgage.  If there were anything in the argument, it would apply more strongly to these dormant judgments, because the owners or their counsel were on the spot and had the control of the judgments, which the complainants had not.

The defendants pretend that by the nonsuit on the *scire facias,* they were induced to believe that complainants had abandoned all claim under it, and it is suggested that the nonsuit was suffered, and the mortgage suppressed, lest the forgery of the name of the last subscribing witness should be *detected.  Who kept [45 it back?  Judge Sherman managed the case at the time; Mr. Silliman was the counsel in the case.  The complainants also brought a *scire facias* on their judgment and suffered a nonsuit, and took no further steps on the judgment.  Precisely the same course as on the mortgage.  The defendants might as well pretend that they believed the judgment fraudulent, and that complainants abandoned all claim under them, as to make that pretense respecting the mortgage.

I would further remark, that if Fricker witnessed the deed after it was executed, it must have been by the request of those interested.  It would have been considered as the neglect of Mr. Silliman which required it to be done, and as he was the person present when the deed was acknowledged, he would have been selected as the most suitable person to obtain the attestation of Fricker.  Mr. Silliman was also the counsel of the bank, and had the defect existed, would have been consulted as to the effect, and had the bank intended to supply the defect, would have advised the mode.  Had any of these things happened, it is not possible . that he could have forgotten them.  The testimony of Mr. Convers also shows that there was no subsequent attestation.  Mr. Buckingham said that the debt was lost because there was but one subscribing witness.  Now this was after the nonsuit, before which the answer states the bank had obtained the attestation.  Had such been the fact, would Mr. Buckingham have stopped here?  Would he not have stated the whole matter, that it was true that there was originally but one witness, but that that defect had been sup-

plied? There is no doubt but that in fact the names of two wit·
nesses were to the deed in 1818; yet that fact is not known to Mr.
Convers, one of the directors of the bank. May we not infer that
the other directors were equally ignorant, and acted under the im-
pression derived from the result of the trial without seeing the deed?

The counsel for defendants, who abstracted the amended an-
swer of the administrators, misunderstood the counsel for complain-
ants, in supposing that they abandoned all claim to relief in res-
pect to the money arising from the sale of Leathers' land; they
abandoned only the claim set up in the bill to be substituted to
the lien of the Bank of Chillicothe on this fund.

46] The facts, as to this fund, as disclosed by the amended *an-
swer are, that Leathers' notes, on which Carpenter was indorser,
had been discounted by the Bank of Chillicothe. By an arrange-
ment of the parties, the notes of Carpenter were substituted for
those of Leathers; Leathers afterward confessed a judgment in
favor of Carpenter, and gave him a mortgage on land; this land
was sold by Leathers, who paid the judgment and mortgage out
of the money received for the land, to the administrators. The
giving of this judgment and mortgage formed no part of the
arrangement between the Bank of Chillicothe, Carpenter, and
Leathers.

The first question is: Had the Bank of Chillicothe a lien on this
money? If they had, it is a lien in equity only; one which a court
of law could not notice.

It does not appear by the amended answer, or any part of the
case, which of the judgments of the Bank of Chillicothe against
Carpenter was rendered on his notes for Leathers' debt; whether
those prior or subsequent to complainant's mortgage. If prior to
that mortgage, the money (on the supposition of lien) should have
been applied to those judgments alone.

Before the defendants can claim that this fund shall be applied
to the judgments subsequent to complainant's mortgage, they must
show that these judgments were rendered on the notes given for
Leathers' debt; for it is only on this ground that the exclusive lien
of these judgments can be supported. As they claim the existence
of the exclusive lien of these judgments, they must show the facts
necessary to support it.

If the Leathers debt, assumed by Carpenter, was not kept sepa-
rate from his own, but all blended together in the several notes

which he gave to the Bank of Chillicothe, then this fund should have been ratably apportioned among all the judgments in favor of the Bank of Chillicothe. In making the payments the administrators so treated it. They did not separate it from the original fund arising from the sales of land; they did not apply it to the payment of any particular judgments, or claim that it should be applied to the judgments subsequent, rather than those prior to complainant's mortgage.

They now claim differently, that it shall all be applied to the subsequent judgments, leaving the whole of the prior judgment a charge on the land.

Complainants contend that the Bank of Chillicothe had no *lien on this fund, that it should have been applied to the [47 payment of the general creditors, or that if a lien existed, all the judgments, as well prior as subsequent, had equal claims.

Complainants admit that the bill must be dismissed as to L. & J. Clark, who purchased and paid the purchase money without notice of the mortgage.

They ask a decree against Noble and Clark for the balance of their purchase money remaining unpaid, with interest; and a decree against the other purchasers for the amount of the purchase money remaining unpaid.

They ask a decree that the judgments in favor of the Bank of Chillicothe prior to their mortgage receive a ratable proportion of the Leathers fund.

They admit that the prior judgments had a lien in preference to the mortgage, and are willing that the proceeds of the first sales should be applied to that purpose, so far as Irvin is interested. Foster and Creed, the other purchasers, have paid no part of their purchase money.

They claim that the administrators are trustees for them for the rest of the purchase money received, and ask a decree against them.

They ask, if it should be found that the Bank of Chillicothe had not a lien on the Leathers fund, that it be apportioned to the general creditors.

They ask that the personal assets should be marshaled; that the case be referred to a master for that purpose, with authority to collect and to pay out the funds according to the principle of the decree, and that the administrator deliver to him all the securities

they have taken, and pay to him all funds in their hands, and for such other relief as they are entitled to.

W. W. IRVIN, for respondents :

In the investigation of this case, the following points, among others, are presented for the consideration of the court:

1. Is the deed on which the complainants rest their claim the act and .deed of Emanuel Carpenter, jr., in the form in which it is now presented to this court?

2. If executed with but one witness, was the consideration such " as to justify the interference of this court?

3. If, in a case between the parties to the deed, the mistake 48] *would be rectified, can it be done against creditors having judgment liens upon the same property, acquired subsequent to but without notice of the claim of the plaintiffs?

4. If originally, the complainants were entitled to relief, is not that right lost by the lapse of time and their own negligence?

5. Has this court, as a court of chancery, other than in cases of contested wills, jurisdiction in all matters of a probate and testamentary character? .

6. Are the purchasers protected by these sales, and did the court act correctly in the distribution of the money arising from the sale of the lands of Fricker, Leathers, and the lands of the in-testate?

1. Is the deed on which the complainants rest their claim the act and deed of Emanuel Carpenter, jr., in the form in which it is now presented to the court?

The complainants, in their original bill, asked the assistance of the court to give effect to a mortgage deed imperfectly executed, inasmuch as there was but one subscribing witness to it at the time of its execution. Subsequently, by leave of the court, they amended their bill, by stating that there were two witnesses to the deed at the time of its execution, and .that it was not an imperfect instrument, as they had supposed.

Two of the defendants, in their answers (Mr. Carpenter and myself), deny that the deed had two witnesses to it when executed, and give it as their belief that it is an altered instrument, and in that opinion they believe they are sustained by the evidence.

The deed bears date August 14, 1816, and was recorded with

42

but one subscribing witness to it, on the 5th of February next thereafter.

On February 5, 1818, Emanuel Carpenter, jr., died, deeply indebted and insolvent. In the month of February of that year, Samuel Carpenter and David Carpenter were appointed his administrators.

In the month of June next thereafter, a *scire facias* was sued out of the clerk's office of the court of common pleas, against the administrators of Emanuel Carpenter, by Wyllis Silliman, Esq., or the late Judge Sherman, as counsel for the complainants, upon the mortgage deed. This suit was brought in the name of David J. Marple, the grantee named in the deed, for the use of the bank.

*At the September term of the court, 1818, the defendants [49 filed their plea of *non est factum* to the writ of *scire facias*, to which plea was annexed the affidavit of one of them, giving as a reason why it was not the deed of Emanuel Carpenter that it had at the time of its execution but one subscribing witness.

One year thereafter, at the September term, 1819, the cause came on for trial, and by agreement the issue was submitted to the court, and upon an investigation of the case the plaintiffs suffered a nonsuit.

On that trial, it was admitted by the counsel for the bank that there was but one subscribing witness to the deed at the time of its execution. This is proved by the depositions of Thomas Ewing, Judge Scofield, and William Cook, then a deputy sheriff.

Mr. Cook says that the understanding was, that Fricker had put his name to the deed as a witness after its execution and delivery.

Mr. Silliman, on his cross-examination, was unable to state anything certain in relation to the attestation of the deed by Fricker, and was equally uncertain what became of it thereafter. He, however, thinks it probable that it was in the possession of Judge Sherman at the time of the trial.

Mr. Boyle was then recorder of deeds for this county, and recorded this deed himself. He says his attention was drawn to the fact that there was but one witness to it when he recorded it, and positively swears that there was but the one. It was so recorded. Mr. Ewing thinks he saw the deed at the trial.

General Beecher swears he then saw it, and that the name of

Fricker was not on it as an attesting witness. Mr. Beecher and Mr. Ewing were then counsel for the Bank of Chillicothe, whose claims against the estate of Carpenter were large; and from the interest they felt for their clients, they watched with attention the trial then progressing, inasmuch as the establishment of the mortgage would have measurably taken from their clients the fund from which their judgments were to be satisfied.

Colonel Daniel Convers, of Zanesville, says that for many years he was a stockholder of the Muskingum Bank, and for one or two years one of its creditors; that when they heard of the loss of the suit on the mortgage it created surprise, and an inquiry was made into the cause of the failure, when it *was ascertained that the suit was lost because there was but one subscribing witness to the deed. Upon his cross-examination, he was asked if the suit was not lost in consequence of the deed being *improperly recorded?* He answered no, and again stated that it was for the want of a second witness to the deed. He also says that he conversed with Mr. Buckingham, the president of the bank, on this subject, and that he complained of the counsel of the bank who took the mortgage, and says he ought to sustain the loss. Under the impression that this debt was measurably lost, Mr. Convers says he sold his stock at a reduced price.

To this may be added the evidence of the complainants themselves. As late as 1827, and for some time thereafter, they and their counsel rested under the belief that the deed was defectively executed, as will appear by the statements in the bill of complaint.

To this volume of evidence what have we opposed? The evidence of Thomas Fricker! Is not the evidence of Mr. Boyle and General Beecher as affirmative as that of Fricker? They saw the deed, and swear from actual inspection that there was but one witness. Fricker swears at that time there were two. Which of these witnesses is to be believed? Will the court reject the evidence of such men as Mr. Boyle and General Beecher, sustained as they are by all the other proofs in the cause, and say that Thomas Fricker alone is entitled to belief?

With this statement of facts, from witnesses of high respectability, a doubt can not exist in relation to the attestation of the deed. Nor can it be believed, in a controversy with the administrators of an insolvent estate for a sum exceeding ten thousand

dollars, that the vigilant and able counsel for the plaintiffs would have admitted that there was but the one subscribing witness to the deed if such were not the fact, especially as Fricker, who had improperly attested the deed, was a resident of the town, and lived so near the court-house that his attendance might at any time have been had within a few minutes. On that trial the plaintiffs were not taken by surprise. They were advised by the pleadings that the execution of the deed was contested. They had the deed in their possession and the witnesses at their command.

The witnesses say that much excitement was caused both in and out of the court by the trial. For a period of twelve *or [51 thirteen years the accuracy of the admissions of the counsel was never questioned by the bank or any one else. I will then ask if it is not now too late to produce a conviction upon the minds of the court that the counsel engaged in the cause, the court who tried it, the defendants, the attorneys, and officers of the court were all mistaken, and that the deed then really had two witnesses to it instead of one?

This court, as a court of equity, is now called upon after a lapse of nineteen years from the execution of the deed, to carry it into effect, as a true and genuine instrument, notwithstanding the whole of the property embraced within it, has been sold to purchasers without notice, and for the full value of the land, and that, too, by order of a court of competent jurisdiction. Neither Mr. Carpenter nor myself had ever seen the deed before our answers were filed. We supposed and believed the alteration was made before the trial, but in what way we gained our knowledge we were unable to relate. The abiding impression upon our minds has been that the name of Fricker was improperly inscribed upon the deed. In other words, we believed that the name of the second witness had been procured to impose upon the administrators, and to secure a legal advantage to the plaintiffs, which, otherwise, they could not possess.

2. If executed with but one witness, was the consideration such as to justify the interference of this court?

The first inquiry is: What inducement was there for Carpenter to execute the deed? His notes were then due, and the holders had a legal remedy to enforce payment. The bank did not bind itself to forbear suing on the notes, and the day of payment was

45

not deferred. It is true, they agreed not to proceed on the *mort-gage* for a given time; but the mortgage was only collateral security, and did not prevent the holders of the notes from proceeding at any time to recover the amount due.

The agreement on the part of Carpenter was purely voluntary, and unsustained by a single benefit to himself. Courts of equity will not decree the specific performance of a voluntary agreement. 1 Madd. Ch. 48, 112–115.

It is, however, said, if a *voluntary deed is sufficient to pass the estate out of the conveyor*, it will be specifically enforced, provided it 52] is supported by a valuable, or at least a meritorious *consideration, such as the payment of debts*, or making a provision for a wife or child. 1 Madd. Ch. 414. In 1 Comyn on Contracts, 8, it is said the civilians held that, in all contracts, either expressed or implied, there must be something given in exchange—something that is mutual or reciprocal.

In the case of Parkhurst *v.* Vancourtland, 1 Johns. Ch. 282, the chancellor says it seems to be very generally and very properly laid down in the books, that a court of equity never will decree performance when the remedy is not mutual, or one party only is bound by the agreement.

In the case of Howell *v.* George, 1 Madd. 12, the chancellor says the want of mutuality in a contract is sufficient ground for refusing a specific performance.

At law a deed imports a consideration; but when real estate is concerned, I apprehend a very different rule prevails in equity. In courts of equity the technicalities of the law are dispensed with. The chancellor, without being fettered by scroll, seals, or wafers, takes a comprehensive view of the subject, and acts upon the merits of the cause. However he may feel himself bound not to set aside the agreements of parties, he never will grant relief, unless the demand of the complainant is sanctioned by the purest principles of equity. Indeed, this principle has been carried so far that the specific performance of an agreement, founded on a good consideration, has been refused when it would operate oppressively upon one of the parties. Sugden's Law of Vendors, 155.

It is said at law that the forbearance to sue, or the giving time to pay a debt, is a sufficient consideration to sustain an action; but in the case now before the court, only the one party is bound, and there is no mutuality of benefit, no forbearance to sue, no giving

of time to pay the debts, for there was nothing to prevent the prosecution of suits the next moment on the notes.

In most of the cases to be found on this subject, an actual consideration existed. Such was the fact in the case of Barr v. Hatch, 3 Ohio, 528, and in the case to be found in Johnson's Chancery Reports, where the deed made by the sheriff did not include all the land sold by him to the purchaser.

Perhaps in the annals of our jurisprudence a few cases *may [53 be found that would seem to warrant a conclusion different from the one for which I contend. If such should be the case, they are at war with one of the best principles to be found in our system, that there must be a mutuality or reciprocity of benefit, a *quid pro quo*, to render obligatory the engagements between man and man. And why should this principle be invaded in this case? The equal distribution of assets among creditors is a favorite doc- trine in equity, and is founded in the purest principles of justice. Such impressions were deeply implanted in the mind of the chan- cellor, who decided the case of Burr v. Burr, 3 Ves. 575, and noth- ing but the force of precedent induced him to depart from the dic- tates of his better judgment.

That case belongs to a different class from the one now before the court, and from the manifest injustice done to other creditors, ought not to be extended beyond the class to which it immedi- ately belongs.

3. If, in a case between the parties to the deed, the mistake would be rectified, can it be done against creditors having judg- ment liens upon the same property, which were acquired subse- quent to, but without notice of the claim of the plaintiffs?

The claims of the Bank of Chillicothe, the Granville Bank, and the other judgment creditors of Mr. Carpenter, were as purely equitable as the claims of the Bank of Muskingum. They suc- ceeded in the race, and secured for themselves the first legal lien, and is it just, now, to take from them that lien, and give it to an- other creditor, who had failed in his attempt to monopolize every- thing for his own benefit?

Between two equities, it is said that the senior shall prevail, but if the legal estate be added to the junior, without notice of the sen- ior, then the junior acquires the priority. Lessee of Hiester v. Fort- ner, 2 Binney, 47. The judge who decided that case says: "Hav- ing the legal estate in him a court of chancery, between two

47

equities, would not interpose to his disadvantage, but w,here the loss had happened, there would it be permitted to continue. It falls within the common rule, that where of two persons equally innocent, or equally blamable, one must suffer, the loss shall be left where it has fallen."

If there be any analogy between the case cited and the one now 54] before the court, then the other creditors have, *without notice of the defective deed, secured a legal lien on the estate of Carpenter. This lien is equivalent to a mortgage duly executed, and has a decided preference over the equitable claim of the plaintiffs. To illustrate my idea more fully, suppose the creditors had taken mortgages instead of judgments, could this court, upon any known principle of equity, set aside the mortgages thus obtained, unless notice could be brought home to the mortgagees of the existence of the prior equitable incumbrance. There is no proof of notice in this case, *actual* or constructive, unless the registry of the mortgage should be construed into constructive notice. In the case referred to in 2 Binney, 47, it is decided that the record of a deed of that character, is not notice to a subsequent purchaser.

In the case of Frost *v.* Bushman, 1 Johns. Ch. 300, the chancellor says, that "the question does not necessarily arise in this case, how far the unauthorized registry of a mortgage, as one made, for instance, without any previous legal proof or acknowledgment, would charge the purchaser with notice of the mortgage. The better opinion in the books seems to be that it would not be notice, and that equity will not interfere in favor of an incumbrancer where he has not seen that his mortgage was duly recorded." The chancellor, in support of this opinion, cites Sugden's Law of Vend. 527; 1 Shoale & Lefroy, 167; 2 Binney, 40.

Section 2 of the act for the recording of deeds, mortgages, etc., passed February 9, 1810, see 8 Ohio L. 97, makes it the duty of the recorder to record all deeds and mortgages, and conveyances of lands and tenements, lying within his county, and also all other instruments and writings which by law are required to be recorded.

The act providing for the execution and acknowledgment of deeds, passed February 14, 1815, see 8 Ohio L. 398, points out what instruments shall be recorded, among which the deed of the complainants is not included.

I take it then as the recording of this deed, with but one wit

48

ness, was not required by law, that the record of it is not notice for any purpose whatever.

If my views of the superiority of the judgment liens over the equitable incumbrance should be correct, then it becomes wholly unnecessary to inquire whether the administrators of Emanuel Carpenter, or the purchasers of the property under *the [55 orders of the court, had, or had not, notice of the defective deed of the complainants. The property was bound without their agency. The liens of the judgment creditors, by the sale, were transmitted to the purchasers, and certainly it will not be contended that the complainants have the right to demand and take from them a greater interest in the property than they could have done from the judgment creditors. It is a settled rule in chancery that a purchaser with notice to himself, from one who purchased without notice of the fraud, may protect himself under the first purchaser. 1 Johns. Ch. 213.

To avoid the effect of the liens which the judgment creditors had acquired, the counsel for the complainants attempted to draw a distinction between what he terms a *lien at large,* and a *specific lien.* I am really at a loss for a reason to sustain the distinction. The statute made each judgment a lien on the lands of the defendant from the first day of the term in which it was rendered. The only difference between a judgment and a mortgage is, that, in one case, the lien is conventional; and in the other, the act and operation of law. In both cases the property is bound to satisfy a particular demand. If the levy renders the lien specific, then it matters not, in this case, whether the distinction exists or not, as executions on all the judgments taken out in the lifetime of the intestate, were levied on the land in dispute. Up to that time the judgment creditors were wholly unaffected by notice of the defective deed, nor is there any evidence of their being advised of it at any time.

4. If originally the complainants were entitled to relief, is not that right lost by the lapse of time and their own negligence?

By the provisions of the act passed January 25, 1816 (see Vol. xiv, part 1, 150) defining the duties of executors and administrators, it is made the duty of the administrators to give notice to creditors by advertisement, to produce their accounts for settlement, legally proven; and, if the personal property should prove insufficient for the payment of the debts due from the intestate, it

then becomes a further duty to apply to the court for an order to sell the real estate.

The complainants know of the death of Mr. Carpenter, and that administration was granted on his estate. They also knew that 56] he died deeply involved, if not insolvent, and that the *administrators were proceeding to settle up the estate. The facts, here referred to, are proven by the evidence of Mr. Silliman, the proceedings on the mortgage, and the admissions in the bill of complaint.

· Very shortly after the nonsuit of the plaintiff in the *scire facias* on the mortgage, application was made to the court, by petition, to sell the real estate of Emanuel Carpenter, to pay his debts; and the first sale of the mortgaged premises was made to myself in July, 1829. Several years elapsed before a sale of the land could be effected. Under the act last referred to, it was doubtful with the administrators whether, as the estate was insolvent, it was their duty to pay all the debts in just proportion; or whether they were to pay first the judgment creditors, according to their respective liens, and then the other creditors, who had no specific liens. For this purpose an amicable suit was brought, and the pleadings so shaped as to obtain the opinion of the Supreme Court on that point. The Supreme Court decided, that the judgment creditors had a preference, and that their judgments ought to be paid according to the priority of their respective liens.

In compliance with this opinion, the administrators applied the purchase money, arising from the sales, to the payment of the respective judgments. This money has not only been applied in discharge of the respective judgments, but, upon a citation served upon the administrators, they made out a full statement of their proceedings, which, at the April term of the court of common pleas, 1828, was submitted to and examined by the court, and ratified and confirmed in all respects, as will appear by the orders of the court.

Mr. Silliman swears that he was the attorney for the bank, and has no knowledge that the claims of the bank were ever presented to the administrators for settlement. The defendant, Samuel Carpenter, in his answer, swears they were not. This is rendered probable, also, by the assignment of these claims, shortly after the nonsuit, and many others, to the United States; and by the complaints of the directory of the bank, that the claims were reduced

Bank of Muskingum v. Carpenter's Adm'rs et nl.

in value by the negligence *of the government;* as a compensation for which the United States relinquished one-half of the interest on a sum exceeding forty thousand dollars for the whole time they held these claims. If a strict computation was made after deducting judgments older than the mortgage deed from the amount for which the *mortgaged premises sold, it is highly probable [57 that the bank made, by the alleged negligence of the United States, more than they could have realized by the sale of the land.

Upon the trial of the *scire facias* the complainants acknowledged that there was but one subscribing witness to the deed, and when defeated by the opinion of the court a nonsuit was suffered. From that day until May, 1829, a period of nearly ten years, nothing more was heard of this debt. It never was presented to the administrators for payment, and it never was intimated to them that it would be, in any form whatever. The notice required by law to be given to the creditors makes them parties to the proceedings of the administrator in the adjustment of the estate. They have a right to except to his accounts when filed for settlement; they have a right to ask for his removal, to cite him to settle, and to contest before the court the correctness of his proceedings in every form. In this case the complainants made no objections to the orders of the court for the sale of the property, they took no step to prevent the sales or the distribution of the purchase money, and they made no objections to the orders of the court confirming the sales.

It appears to me that the complainants, if they ever had a claim, are too late in now presenting it to the court. They have been guilty of the grossest negligence, the effect of which, if their deed is now set up, must be seriously injurious to all concerned.

The negligence of the United States, while they held this claim, was urged by the officers and agents of the bank, and, from a sense of justice, they were compensated for that negligence; and now they are asking that they may be recompensed, by taking from those who bought in good faith and for a valuable consideration. Had the complainants pressed their claims in good time all this trouble would have been saved. The administrators and the purchasers had no wish to take from them a single cent; it was to them wholly immaterial *to whom* the purchase money was paid. Acting, as they did, in good faith, the penalty now sought

to be inflicted on them will be indeed severe for not adjusting a claim which was abandoned by the complainants themselves.

5. Has this court, as a court of chancery, jurisdiction other than in the case of contested wills, of matters of a probate and testamentary character?

58] *The second clause of the third article of the constitution provides that the Supreme Court shall have original and appellate jurisdiction, both in common law and chancery, in *such cases as shall be directed by law.*

The fifth clause of the same article declares that the court of common pleas in each county shall have jurisdiction of all probate and testamentary matters—granting administration, the appointment of guardians, and such other causes as shall be prescribed by law.

The act of the legislature directing the mode of proceeding in chancery, which was in force when this suit was brought (see vol. xxii. 75), gave to the court of common pleas chancery jurisdiction in all cases properly cognizable by a court of chancery, in which *plain, adequate,* and *complete remedy* could not be had at law.

The same act gave to the Supreme Court concurrent jurisdiction in all cases cognizable by a court of equity, when the title of land is in question, or the sum or matter in dispute exceeds one thousand dollars, and appellate jurisdiction in all cases regularly brought before them from the chancery decisions of the courts of common pleas.

In the act defining the duties of executors and administrators, the duties of the court of common pleas are pointed out, and there is but a solitary case, the contest of wills, in which there is a gift of jurisdiction to a court of chancery.

The constitution and the laws have, by a complete gift of jurisdiction to the common pleas, settled the question as to the *adequacy* of that court to grant relief in all questions of a probate and testamentary nature, and nothing was left for the discretion of a court of chancery, in relation to the *adequacy* or *inadequacy* of the court to perform the duties assigned to it by law. The attempt to take from, to limit, or to control the court of common pleas in the exercise of a jurisdiction thus conferred, is an unwarrantable assumption of authority, and unsustained by the policy which has been prescribed by the supreme authority of the state.

The right of the court to entertain jurisdiction where there is a

trust in relation to lands, or where fraud has intervened, is not questioned, but we object to those parts of the bill in which complaints are made that the administrators have not done their duty, and by which they are called upon to adjust their accounts in this court, and to pay to the complainants *their proportion of the [59 estate. How is this to be effected? Will this court, upon the application of any discontented creditor, enter into an investigation of every item of an estate? or will they refer it to a master? It then becomes a question of policy whether a master in chancery is better qualified or more likely to do justice than the judges of the court of common pleas. This matter I take to be settled by the constitution and laws, and nothing is left for the undefined discretion of the chancellor.

Should the court decide that they have jurisdiction, I presume it will be admitted to be *concurrent* and not *supervisory*.

If concurrent, the pleadings and evidence show that there has been a disposition of the personal estate, and of the whole of the real estate of the decedent; that the money has been in part collected and paid out, and that the proceedings of the administrators have been submitted to, and sanctioned by the court of common pleas.

On April 4, 1828, the administrators, having the previous term, presented their accounts, made a settlement with the court. The exhibits marked A, B, C, D, E, F, G, H, I, J, and K, present an accurate history of that settlement.

Exhibit H contains a statement of the amount received from the personal property, and the manner in which it had been distributed.

Exhibit K contains a statement of the sales of the real estate made by the administrators, including the sum of about four thousand dollars, received for the sale of the lands of Frederick Leathers, amounting in all to the sum of.................. $12,815 20
Out of this fund payments, on judgments binding the
   estate, and other claims having a preference, were
   made, amounting to the sum of.......................... 11,093 56

Leaving a balance of........................................... 1721 64
At that term, the following entry was made upon the journal of the court:

" The administrators of E. Carpenter, jr., deceased, having

previously filed their accounts for settlement, this day the court, having fully inspected the disbursement and payments made as per statement, marked H, for five hundred and ninety dollars and fifty-six and one-fourth cents, including allowance to the administrators, do approve the same, and order it to be recorded. The court having, also, examined statement K, and the payments and disbursements therein made, approve the same, and order that a 60] record be made *thereof—which payment and disbursements, including allowance to administrators, amount to eleven thousand and ninety-three dollars and fifty-six cents."

After the settlement, and before the filing of the bill,
other sales of real estate were made, amounting to
the sum of....................................................... $1366 34

Between these periods, the administrators paid out of
the moneys received from land sales, on judgments
and for expenses incurred, the sum of .................. 1493 59

Leaving a balance in favor of the administrators of.... $127 25

This sum of one hundred and twenty-seven dollars and twenty-five cents, when taken from the residue of exhibit K, will leave in the hands of the administrators, arising from the sale of real estate, including the whole of that embraced in the mortgage deed, the sum of fifteen hundred and eighty-four dollars and thirty-nine cents, from which is to be deducted the costs of administration on land sales, counsel fees, etc.

The complainants object to this settlement, because, as they say it was made at the same term in which the papers were filed for settlement. In this they are mistaken. But if they are not, this court as a court of equity, can not correct the errors of a court of law, Stiver *v.* Stiver, 3 Ohio, 19; nor can the decision of a court be collaterally impeached.

Unless there is proof of fraud in the settlement, as was the fact in the case of Piatt *v.* St. Clair's Administrators, I take it that this court can not, and ought not to interfere.

6. Are the purchasers protected by these sales, and did the court act correctly in the distribution of the money arising from the sale of the lands of Frederick Leathers, and the lands of the intestate?

On August 7, 1816, the Bank of Chillicothe recovered three judgments in the Supreme Court against Emanuel Carpenter,

Bank of Muskingum *v.* Carpenter's Adm'rs et al.

amounting in all to the sum of forty-two hundred and twenty-one dollars and nine cents. At the death of Mr. Carpenter, there remained due on these judgments, exclusive of interest and costs, the sum of nineteen hundred and forty-four dollars and fifty-five cents. This sum, it is admitted, had the superior lien upon the mortgaged premises. To satisfy these, and other judgments to a large amount, a sale was made by order of the court on July 18, 1820, of a part of the mortgaged premises, which, by permission of the court, had been divided into lots. At that sale, Frederick A. Foster purchased lot No. 3, containing three and seventy-five one hundredth acres for one hundred and fifty-five dollars and sixty-two cents. John Creed purchased lot No. *7, containing five [61 acres for one hundred and thirty-five dollars; and lots, 1, 2, 3, 4, 5, 6, 8, containing in all seventy-five and thirty-eight one hundredth acres, were sold to myself, for two thousand and ninety-one dollars and forty-four cents. No other sales of this property were effected until October 17, 1823.

So far, then, as these purchasers are concerned, the authority of the administrators to sell, is unquestioned; and it is wholly immaterial whether they had or had not notice of the deed of the complainants.

On August 12 and 14, 1817, the following judgments were rendered in the Supreme Court, against Emanuel Carpenter:

One in favor of the Bank of Chillicothe, for the sum of..$1,719 51
One other in favor of the same..................................... 1,743 86
One in favor of Bostler & Co., for............................... 671 48
One in favor of John Baldwin, for............................... 478 50
One in favor of Gilman & Amidon, for...................... ... 878 39
One in favor of the Granville Bank, for....................... 1,753 73
On September 29, 1817, a judgment was rendered in
    favor of Edward & G. Twells, for...................... 1,228 96
And on October 3, 1817, two other judgments were ren-
    dered in favor of the complainants, one for......... 1,733 75
The other for................................................... 2,313 52

The last two judgments were rendered on notes, intended to be secured by the mortgage. Each of the above judgments, had priority of lien upon the real estate of the intestate to those of the complainants, except the one in favor of Godfrey & Edward Twells, and in that case the plaintiffs gained priority by their vigilance.

The September term of the court of common pleas, 1817, com-

menced on the 29th of that month,. and ended on the 4th of Octo-
ber.   October 15, 1817, an execution was sued out on the judg-
ment in favor of E. & G. Twells, and placed in the hands of the
sheriff on the 17th.   On the 20th of October executions were sued
out on the judgments of the complainants.

The act then in force, gave no preference to executions sued out
within ten days after the term in which judgments were ren-
dered ; but after that time the execution first sued out was to be
first satisfied.   A question of precisely this character was de-
cided by the Supreme Court in Fairfield county, in the case of the
Bank of St. Clairsville v. The Sheriff of that County.

62]   *Upon all the judgments to which I have referred, execu-
tions were sued out and levied on the tract of land mentioned in
the mortgage deed, prior to the March term of the court of com-
mon pleas, 1818.

In paying out the money arising from the sale of lands, the ad-
ministrators, in compliance with the decision of the Supreme
Court, satisfied these judgments according to their respective liens,
and were sustained in so doing by the court of common pleas at
the settlement in 1829.

The money arising from the sale of the property of Frederick
Leathers, was applied to the payment of the judgments rendered
in favor of the Bank of Chillicothe, on August 14, 1817, and satis-
faction was entered for the amount paid on the execution docket
by the counsel for the bank.   Of this act the plaintiffs complain,
and say that the money ought to have been equally divided, as
personal property, among all the creditors.

The complainants, in their bill, inquire of the administrators,
how this claim against Leathers originated, which information is
given by the answer of the administrators.   The answer is re-
sponsive to the bill, and as the plaintiffs have adduced no evidence,
is conclusive upon that point.   The administrators, in their answer,
state that Emanuel Carpenter gave his notes to the Bank of Chilli-
cothe, in part for the debt of Frederick Leathers, upon which the
judgments referred to were rendered.   As a security to Mr. Car-
penter for his liability, Leathers confessed a judgment, on which
his property was sold.

This property was held in trust by Emanual Carpenter, and
every principle of equity required the application of it in ex-
tinguishing the debt for which it was given in security.   This

money, if not subject to distribution as personal property, the complainants contend ought to have been apportioned among all the judgments in favor of the Bank of Chillicothe.

The Bank of Chillicothe held two securities for their debt, both of which were necessary for its safety if the mortgage deed is sustained. If a party has two securities, and both ample, I admit that a court of equity will compel him to surrender one of them; but this is the first instance in which I have heard it contended, that a court of equity will require such a distribution of two securities as to render them *insufficient for the payment of [63 the debts for which they were given. This will be the case in this instance, if the complainants are sustained in the principle for which they contend. If one-third of the money arising from the sale of the property of Leathers should be applied to the payment of the first three judgments, it will lessen the extent of the lien on the mortgaged land; and if the mortgage is sustained, the residue of the money arising from the sale of the property of Leathers, will be insufficient to pay the last judgments. Such a distribution of two securities, it is believed, never will be required by a court of equity.

As the judgments were not revived against the administrators of the intestate, it is contended that they have become dormant, and that the liens are lost. This assumption is unsustained by the decision of the Supreme Court to which I have referred, and is wholly irreconcilable with the provisions of the act of February 11, 1824, defining the duties of executors and administrators. That act makes it the duty of the administrators to pay: 1. Funeral expenses and costs of administration: 2: Judgments rendered against the intestate *in his lifetime,* according to their respective *priorities,* so far as the same operated as a lien on *the estate of the testator in his lifetime.* Under the provisions of this act many of the sales were made. It is not however necessary to press this inquiry, as the executions were taken out in October, 1817, and levied before the death of the intestate. When execution is taken out in the lifetime of the judgment debtor, and levied either before or after his death, there is no principle better settled in our law, then that the plaintiff may proceed to sell the property taken in execution without reviving the judgment against the representatives of the deceased.

If an alteration was made in the deed, I presume it will not be

necessary for me to make a single suggestion in relation to the impropriety of its receiving the concurrence or sanction of a court of equity.

H. STANBERY, on the same side :

I do not propose to argue the question as to the attestation of the mortgage. That is so purely a question of fact, to be determined in part by inspection of handwriting, and has been so. fully considered by my colleague, that further argument is unnecessary.

64] *If the court should be of opinion that the mortgage was duly executed, it is next to be inquired what relief. the complainants may be entitled to, as it respects the purchasers of the mortgaged premises, the administrators, and the fund yet remaining for distribution.

1. As to the purchasers : It is admitted by the counsel for the complainants, that those who had not actual notice of the mortgage at the time of their purchase and payment of purchase money, are protected. Notice is not pretended as to any one of them except Irvin, and he is not affected by it.

*First.* Because the only knowledge he had of the mortgage before the filing of this bill, was connected with information of its being an altered instrument.

*Second.* Because at the time of his purchase there were judgments older than the mortgage, to be satisfied, and the duty of appropriating the money did not devolve upon him.

2. As to the administrators : It can not be denied that the order for the sale of this land conferred upon the administrators the power to sell ; that is impliedly conceded in the admission that the purchasers at the sale took a good title. The administrators then, so far as the sale of the land and the receipt of the purchase money were concerned, acted in conformity with the law. Then comes the distribution of the money, and here the, first question arises. The complainants contend that the administrators were bound, after satisfying the three judgments of the Bank of Chillicothe, to pay the amount due and secured by the mortgage, in preference to the subsequent judgments ; and that their failure to do so has entitled the complainants to a decree against them for the entire fund so misapplied.

For a right understanding of this question, it is necessary to

have a view of the statutes upon the matter of distribution and the administration of assets in force whilst these proceedings were in progress.

The act of January 28, 1816, 2 Chase's Stat. 929, was the law in force at the decease of Carpenter and the sales of 1820 and 1823. Section 33 authorized the sale of the real estate for the payment of debts, and directed the administrators to pay out the proceeds to the several creditors, and report proceedings from term to term.

There is no distinction made by the terms of this section between debts which have a lien and those which have not; but by construction it has been settled, and without doubt, *correctly, [65 that priorities existing at the decease were to be regarded in the distribution.

Next in order is the act of February 11, 1824, 2 Chase's Stat. 1308.   Section 18 directs the administrators to pay *judgments* according to their priorities, so far as the same operated as a *lien,* and no farther, from the fund arising from the lands bound by the judgments; the amount to be determined by the court, and to distribute the remainder among the general creditors; and it further provided that no execution should be issued on judgments rendered in the life of the intestate within the time allowed for the settlement of the estate ; and that the purchaser should get a title unincumbered by the judgments.

By the amendatory act of February 7, 1825 (2 Chase's Stat. 1464), it is provided that in all cases where land bound by judgment and subsequent mortgage should be sold by the administrators under an order of court, the purchaser should take, discharged of the mortgage, judgments be first paid, and remainder applied to the mortgage as in sales on execution.

This act is the first in which any mention is made of a mortgage; and it contains a special direction of what shall be done with the money where land is so situated.   It did not alter the law, or confer a power to sell in this condition of incumbrances which had not a previous existence ; for the prior judgment being the first lien must have been satisfied out of the land, notwithstanding the subsequent mortgage on the same land.

The judgment creditor had the right to enforce a sale during the life of the intestate, and the sale would have carried the whole title, notwithstanding the mortgage.   The death of the judgment debtor did not take away the liability of the fund, but it sus-

pended the right to have execution, and transferred the power to sell to the administrators, who, out of the proceeds, were directed to pay the judgment.

The next act is that of March 12, 1831 (3 Chase's Stat. 1781), now in force, and which repeals the foregoing. Section 29 provides that after the funeral expenses, etc., the administrator shall pay mortgages and judgments rendered in the life of the decedent, according to their priorities of lien, so far as the same operated as a lien in the intestate's life; the proceeds to be applied to the lands bound by the mortgages and judgments.

It is very clear, from the necessary meaning and construction 66] *of the act of 1816, and the express language of the subsequent acts, that, upon the sale of the real estate, the administrator was to pay debts according to their *liens* upon that fund, and according to the *priority* of lien. That being the law, let us begin our consideration of this case at the point of time when the money arising from this land is yet in the hands of the administrators for distribution; although, by the way, the complainants may have had rights then, which have since been lost. Here, then, were judgment creditors having liens upon this land, and a creditor who has a mortgage on record with but one subscribing witness. It is admitted by the opposite counsel that the record is not notice. Suppose the administrators to have actual notice of this record, are their consciences so affected by it, that they are bound to take care of the *equity* of the mortgage, and prefer *that* to the *legal lien* of the judgment creditors? An administrator does not stand in the light of a purchaser with notice of a prior equity. He is an agent of the law appointed to perform certain duties, and as it respects the distribution of the assets, he must prefer debts having liens to those which have not, and only pay respect to the liens as they existed at the death of his intestate. He has nothing to do with equitable rights. But we must go a step further to embrace all the facts; and, besides the notice to the administrators of the recorded mortgage, we must suppose them to have further notice that the original mortgage, with but one witness at the time of its execution, was subsequently made void by the unauthorized addition of another witness. That state of information would prevent them from even recognizing the original equity. And yet this is the true point of view in which this case is to be regarded before the distribution. If the complainants had rights, if they were

Bank of Muskingum *v.* Carpenter's Adm'rs et al.

able to show a state of facts different from that of which the administrators were then advised, it was incumbent upon them, then, to assert those rights whilst the funds were yet in the hands of the administrators. So far from doing so, by a most unaccountable *laches*, they sleep on those rights from 1819 to 1829, a period of ten years; during which the land was sold, the money distributed, and the proceedings were approved by the court.

It is not pretended by the complainants' counsel that they can now open that distribution, and have a new appropriation of the money. They admit there is no recourse *against the pur- [67. chasers to make them pay a second time, nor against the judgment creditors to make them contribute to the mortgage out of the sums they have received. It is equally out of the question to ask relief against the administrators.

Thus far we have considered the rights of the complainants as they may have existed prior to the distribution and the settlement with the court. If it can be maintained that they might then have successfully asserted their priority, it is a very different question whether they can do so now—at least, so far as the money has been distributed. That distribution, by the admission of the complainants, has at least operated this change—that, as prior to it their right might have been asserted to the fund, so now, that it has been had, that right can only be urged against the administrators and the purchasers, with notice. The settlement must therefore stand; and no right ascertained by it is sought to be disturbed. So far, then, as the administrators are concerned, it becomes a question of personal liability, resulting from some misconduct in their representative capacity. What is this misconduct? Does it assume the character of a fraud? Certainly not. They acted in good faith. They stood in the relation of trustees holding a fund to be distributed to various creditors according to their legal liens. In the discharge of that duty they paid out the fund; and the judicial tribunal, appointed by the law to pass upon their proceedings, sanctioned this disbursement. It is urged, by the opposite counsel, that this settlement does not avail to protect the administrators, because they were guilty of a sort of *suppressio veri*, in not bringing before court, at the settlement, the equitable rights of the complainants. If they had brought to the notice of the court all their knowledge of this mortgage, in what respect would it have benefited the complainants? The

*truth,* according to their knowledge, was that this mortgage was a void instrument, by reason of the addition of a subscribing witness; and one of them had sworn to his belief of that fact in defense of the *scire facias*—and they had seen that litigation abandoned upon the admission of its truth by the counsel for the complainants.

If there were neglect in the timely presentation of these equita-'ble rights the *laches* must rest exclusively on the complainants. Those rights had relation to a fund. That fund was distributed among creditors. There yet remained one more act before it 68] should be forever gone from their reach—*the sanction of the court to its distribution. That sanction was given in a judicial proceeding especially provided for the determination of con-flicting rights. It is binding upon the complainants, so far as their right to the *fund* is concerned; and it is, under the circum--stances of this case, a complete protection to the administrators. They are discharged of that part of their trust. The attempt to impeach the validity of that settlement upon the suggestion that it was had at the same term to which the accounts were filed, fails for the want of proof. So far as anything appears in the answers or testimony, as to the settlement, it seems to have been regular. There is no proof of the fact suggested; and, inasmuch as the order has been made by the proper tribunal, the presumption that it was legally made necessarily attaches.

Upon the whole, I am unable to see, in this branch of the case, any ground upon which a court of equity can be called upon to give relief against these administrators.

3. As to the undistributed money arising from the sale of the premises embraced in the mortgage. As against the general creditors without lien, the mortgage might be set up; but not as against the judgment creditors, who, in consequence of their levies in the life of Carpenter, had acquired a *special lien* on these premises. The authorities relied upon by the complainants are to that effect. Powell on Mortgages, 434, and cases there cited. In the case of Burr *v.* Burr, 3 Ves. jr., 573, the question was, whether an important bond should, after the death of the debtor, be set up in equity as a preferable lien to the simple contract creditor's? Upon opening the case, the lord chancellor inquired if there were any case in which a contract to give security to bind land would, as against creditors, be set up in the distribution of assets? After further argument and much hesitation, the chancellor does give

the relief against the simple contract creditors. It is evident from the whole case—indeed, it is admitted by the counsel (Solicitor General's *Arguendo*, 579)—that relief could not be had against creditors having specific liens.

LANE, J., pronounced the opinion of the court:

Before the plaintiff can set up a higher claim than a simple contract creditor he must establish the validity of his mortgage. It is asserted to be made void by a material alteration since the grantor's death, in adding the name of an attesting witness. If we look to the testimony of the defendant only we should *find it difficult to evade this conclusion. [69

Evidence is adduced tending to show that the name of the subscribing witness was not written by him. Witnesses the most unexceptionable, with means the most ample of learning the facts, including the spectator, the lawyer, and the judge, *almost* prove that the deed was exhibited at the trial, with this defect. The parties most interested in supporting the deed seem to have acted upon the opinion that the instrument was not valid. It is a striking example of the uncertainty of memory, to find this body of testimony completely disproved. The affidavit of one of the defendants to the truth of the plea to the *scire facias*, drawn up by another defendant, shows that at that time the deed had two witnesses, for the ground of resistance to it is, that the name of the second witness had been added to it, since the record. There is no sufficient proof of forgery, especially against the witness' own oath. The grantor intended when he made it, to make a good mortgage; a fraud is not to be presumed. Since, then, it is shown to have existed at the time of the trial, with the names of two witnesses, it is more probable, either that it always had two, one of which was omitted by the recorder, or if one was added subsequently to the registration, that it was added while the grantor was living, and with his consent. If either of these suppositions is true, the deed, although it conveys no legal estate, from the defective registration, is a good equitable mortgage, binding the mortgagor, his administrators and his heirs; affecting their rights from the time of its execution, as much as if it passed an estate at law.

There are judgments rendered in Fairfield county, both before and after the date of the mortgage, which are liens upon the land of the decedent. The three in favor of the Bank of Chillicothe,

having been rendered earlier than the mortgage, are admitted to be preferred. In regard to the others, the question is presented, whether an equitable mortgage, or a judgment at law, has the preferable lien.

Whenever rights are acquired, depending on, or in reference to specific property, they are regarded as possessing a superior equity to a general lien upon all the estate of a debtor, as the lien by judg ment. The latter do not constitute a property *per se*, or a right in the land itself; it only confers the right *to acquire* such a property by levy. A mortgage is sometimes called a lien for the debt, but it, is something more; it is a transfer of the land itself; the mort-
**70]** gagee is purchaser. *2 Cranch, 355; 3 Ib. 73; he takes the interest of the debtor subsisting at that time, and no posterior rights can be preferred to his. Such is the plaintiff's position; he has a specific interest in the lands, and is entitled to a preference over creditors by subsequent judgments. 2 Peere Williams, 279; 3 Vez. 581; 3 Dess. 568; 3 Ohio, 539; 5 Ib. 181; 1 Pow. Mort. 279; 2 Ib. 519; 2 Pow. Cont. 60; 4 Kent's Com. 154; 1 Ohio, 258; 10 Mod. 468; 1 Pet. U. S. 388; 4 Johns. 216.

When a trust to sell and raise money is created by the parties, by a deed, through which the purchaser traces his title, and in which the object of the trust is defined, it seems a rule in equity, that the purchaser should look to the application of the money; but where the law creates a trust, or confers authority to execute a trust, it imposes upon the purchaser no obligation to apply the money, further than to pay it to the trustee. This rule furnishes a principle in the present case; we find the administrators, the trustees created by law, for the purpose, and invested with authoriy to sell the assets, as a trust fund, and to distribute the avails according to the respective rights of creditors, and giving bonds to secure to all interested the faithful execution of these duties. It is a well settled principle of policy and law, to apply such rules to these sales as tend to confirm and render certain the titles they pass. 3 Ohio, 561. As it is made their duty to sell the land for the purpose of paying the debts, purchasers may safely buy, in the forms of law, and on payment hold it exempt from the lien, leaving the holder of the lien to look to the trustee and his security, for the faithful application of the money. Those defendants, therefore, who have purchased from the administrators, hold the land free from these incumbrances; the suit may be dismissed as

to such as have paid the purchase money; those who have not, are retained as parties, to secure the appropriation of the money due.

It is urged that the administrators were justified in distributing the assets of the estate among the other creditors, without regard to this claim of the plaintiffs, because no demand for the payment of it was made. But the administrators had notice of its existence, by the *scire facias;* notice, it is true, of a defective legal conveyance, but indisputable notice of the existence of the debt, and if we hold them to a knowledge of the law, notice of a good incumbrance in equity. They were not justified, with this knowledge, in distributing the estate *without providing for these claims. [71 If their extent or validity were doubtful, it would have been an obvious dictate of prudence to institute proceedings in chancery against all parties, by which all rights and interests would have been defined and settled; for the settlement of an estate in a court of probate is an *ex parte* proceeding, *prima facie* evidence only of correctness, and binding no rights, except where made in conformity to law.

A part of the assets received from the administrators have been derived from the sale of the Leathers' land. Leathers, with Emanuel Carpenter his security, was indebted to the Bank of Chillicothe; by an arrangement between them, the debt was assumed by Carpenter, and is embraced in the judgments which the Bank of Chillicothe obtained against him. To indemnify Carpenter, Leathers confessed a judgment binding his lands, the avails of which were applied, before the institution of this suit, upon a judgment of the Chillicothe Bank, rendered subsequently to the plaintiff's mortgage. The plaintiff asks to appropriate this sum upon the elder judgments of the Bank of Chillicothe, which subsisted at the time of his mortgage. The justice of this claim is not acknowledged; although a creditor with one fund can compel the creditor with two to exhaust the one he can not reach, before recurring to the other, it is too late to interfere with the application of money already made in good faith, by the creditor or the debtor.

We are, therefore, led by these principles to the conclusion that the mortgage deed is evidence of a debt against the decedent, which the service of the *scire facias* made known to the administrators; that it bound the land, from its date, as to all subsequently accruing rights (there being no purchasers for a valuable consid-

eration, without notice), and is to be postponed to the three elder judgments of the Bank of Chillicothe only: that the purchasers of the lands from the administrators, under the order of court, hold them discharged from liens, but the moneys produced are to be distributed after the priorities of lien attaching to the lands. The mortgage being intended by the parties to secure all the plaintiff's debts, the avails of the land mortgaged, after extinguishing the lien of these judgments, are to be distributed equally upon all, as well those in judgment as otherwise. That the plaintiff's debts in judgment, reduced by the above payment, are a lien, 72  like other *judgments, upon the other real estate, if any be found; and the unpaid balance of all the plaintiff's debts is a general debt against the estate. The case is remanded to the county, that an account may be taken upon these principles.